IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 16, 2019

## ROBERT NELSON BUFORD, III v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County
No. 2008-B-1355    Angelita Blackshear Dalton, Judge**

_____

### No. M2018-02176-CCA-R3-PC
_____

Petitioner, Robert Nelson Buford, III, appeals the denial of his petition for post-conviction relief. Following a jury trial, Petitioner was convicted of facilitation of felony murder and facilitation of attempted especially aggravated robbery. The convictions were affirmed on direct appeal. *State v. Robert Nelson Buford, III*, No. M2011-00323-CCA-R3-CD, 2013 WL 375424, at *1-6 (Tenn. Crim. App. Jan. 31, 2013). Petitioner contends on appeal that the trial court erred in denying the petition for post-conviction relief because he was denied effective assistance of counsel. Following a review of the briefs and the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Joseph L. Morrissey, Jr., Nashville, Tennessee, for the appellant, Robert Nelson Buford, III.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Amy M. Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

#### OPINION

**Background**

The facts of this case as set forth by this court on direct appeal are as follows:

At trial, Janice Tuders, the victim's mother, testified that the victim was thirty-three years old when he died. On January 21, 2008, the victim worked at the Texaco Xpress Lube on Clarksville Pike. He got off work about 5:15 p.m., received seventy dollars in cash from his employer for his day of work, and walked to the convenience store next door to buy a pack of cigarettes and a lottery ticket. The victim carried a wallet with him sometimes, but Ms. Tuders did not know if he had his wallet on January 21.

Officer Eric Richardson of the Metropolitan Nashville Police Department (MNPD) testified that on January 21, 2008, he was dispatched to an area near the Texaco Xpress Lube and arrived at 6:13 p.m. Other officers were present and tending to the victim. Officer Richardson found a spent shell casing, which had been ejected from a semi-automatic weapon, on the ground.

Detective Norris Tarkington of the MNPD testified that he arrived at the crime scene thirty to forty minutes after the initial call. Standing on Clarksville Pike and looking at the Texaco Xpress Lube, a car wash was to the right of the Xpress Lube, and the Bordeaux Phillips 66 convenience store was to the right of the car wash. Hunter's grocery store was across the street from the three businesses. Detective Tarkington found a spent nine millimeter shell casing in front of the car wash's office and a twenty-dollar bill and a lottery ticket close to the car wash's office door. A blood trail led from the car wash to the back of the Xpress Lube, where the victim was found, and a pool of blood and a knit cap were on the ground near the victim. From the evidence, Detective Tarkington determined that the victim was standing close to the office door of the car wash when he was shot. The victim ran through one of the car wash bays and behind the Xpress Lube, where he collapsed in the parking lot.

On cross-examination, Detective Tarkington acknowledged that Clarksville Pike was a busy street and said that the victim was shot about the time "rush hour" ended. The grocery store across from the car wash had outside lights, but the lights were not bright. The Phillips 66 convenience store to the right of the car wash was known as a busy store and was well-lit.

Donna Jones testified that on January 21, 2008, she and her teenage son went to Hunter's grocery store on Clarksville Pike. As they were leaving, Jones heard gunshots across the street. She looked at the car wash and saw three African-American men running and laughing. The

- 2 -

men ran from the car wash and got into the passenger side of a sport-utility-type vehicle (SUV). Jones said that she did not see their faces but that "two were probably younger men, but one was an older man." When Jones and her son got into their vehicle and pulled onto Clarskville [sic] Pike, the SUV was in front of them. Jones drove home and telephoned the police. She and her son gave statements to the police, and her son may have given the police a partial license plate number. The police showed her photograph arrays, but she could not identify anyone.

On cross-examination, Jones acknowledged that she had testified in previous trials and hearings related to the victim's death. She also acknowledged that she previously testified that she could not remember if she saw two or three men. However, she stated, "I think it was three." Detective Harold Haney of the MNPD testified that shortly after the shooting, he learned about surveillance video showing the shooting. He obtained the video, and the State played it for the jury. The video camera, mounted at the Phillips 66 convenience store and turned toward the self-service car wash, shows some of the car wash bays. A person walks through one of the bays, toward the surveillance camera, and out of view on the bottom left of the screen. About one and one-half minutes later, two individuals walk through the adjacent, lighted car wash bay. They walk toward the surveillance camera, in the direction of the first person, and out of view on the bottom left side of the screen. Shortly thereafter, a fourth person walks through the same lighted bay and out of view but on the bottom right side of the screen. Less than one minute later, the victim appears on the bottom left of the screen, walking away from the Phillips 66 convenience store and toward the car wash bays. Someone approaches him from behind and hits him on the head. As the victim runs toward the car wash bays, the shooter points the gun at him. A flash of light appears as the shooter fires the gun at the victim. The victim runs through the lighted car wash bay and out of view at the top of the screen. The shooter and another person, who are the same two individuals seen walking together earlier in the video, run through the adjacent bay and out of view.

Jenness Schuhmann testified that in January 2008, she worked as a crime scene technician for the MNPD. On January 21, 2008, she went to the scene of the shooting and collected a knit cap, a twenty-dollar bill, a Lotto ticket, and a nine millimeter shell casing. She also took photographs of the scene.

Lieutenant Frank Ragains of the MNPD testified that he lifted fingerprints off the suspects' SUV. Lorita Marsh of the MNPD testified as an expert in latent print examination that she examined the lifted prints and compared them to the five defendants' fingerprints. Marsh concluded that Kevin L. Buford's fingerprints were on the Explorer's driver-side and passenger-side front doors. Raymond Pirtle's fingerprints were on the driver-side and passenger-side rear doors. The appellant's fingerprints were on the passenger-side front and rear doors. On cross-examination, Marsh testified that she could not determine the ages of fingerprints.

Twenty-year-old Raymond Pirtle testified that he was friends with Kevin D. and Deangelo Buford, the sons of Kevin L. Buford, and had gone to school with them since the eighth grade. Pirtle said he carried a gun for protection. About two weeks before the crimes, Kevin D. asked Pirtle for the gun, and Pirtle gave it to him. Pirtle said that about noon on January 21, 2008, Kevin D. came to Pirtle's home and asked if Pirtle "[wanted] to ride" with him and "do a robbery." Pirtle told him yes and got into a four-door Ford Explorer with him. Kevin L. was driving the SUV, and Deangelo was sitting in the front passenger seat. Kevin D. sat behind Kevin L., and Pirtle sat behind Deangelo. Kevin L. drove to the Burger King on Gallatin Road and told the three juveniles about a car dealership they could rob. Deangelo had Pirtle's gun, and the three juveniles walked to the car lot. However, they were scared and returned to the SUV. Kevin L. was disappointed that they had not committed the robbery and tried to get them to return to the car lot, but they refused. Kevin L. drove to an Auto Zone and went inside to see if surveillance cameras were in the store, but he returned to the Explorer and drove away from the store without telling the juveniles anything.

Pirtle testified that Kevin L. claimed he did not have enough money to buy gasoline and drive them home. Pirtle was friends with someone named "Little E," so Kevin L. drove to Little E's house. Little E walked outside to the Explorer, and Pirtle bought some marijuana from him. Kevin L., Kevin D., Deangelo, and Pirtle smoked the marijuana in the Explorer. Then Kevin L. drove downtown and picked up the appellant. Pirtle had never met or seen the appellant before that day, and the appellant sat in the backseat of the Explorer, between Kevin D. and Pirtle. Kevin L. drove to a liquor store on Jefferson Street and told everyone in the Explorer, "'I'm fixin to go in here and I am fixin to buy some liquor and I am going to tell y'all who is cashing their check and then when they come out that is when y'all rob them.'" Kevin L. went into the liquor store, bought some vodka, and returned to the Explorer.

He told them to rob an African-American man, but they did not want to rob the man because too many people were outside the store. Kevin L. came up with a plan for the appellant to rob Little E. He drove to the Buena Vista Market and told the juveniles to telephone Little E and have Little E meet them there. The appellant got Pirtle's gun from Deangelo, got out of the Explorer, and waited for Little E to arrive. When Little E arrived at the market and approached the Explorer, the appellant pretended not to know anyone in the Explorer, walked up to Little E, pointed the gun at him, and demanded money. Little E threw his money onto the ground. Pirtle did not know whether the appellant picked up the money. However, after the robbery, he saw the appellant run through a field. A short time later, Kevin L. picked up the appellant. The appellant still had Pirtle's gun.

Pirtle testified that Kevin L. told everyone in the Explorer, "'Y'all got 15 minutes to do a robbery, because I have got to pick up my wife from work.'" He pulled into one of the bays at the Xpress car wash on Clarksville Pike and saw the victim, who had walked through the car wash. Pirtle said that the victim was counting money and that Kevin L. told them, "'That is who y'all need to rob. He got some money right there.'" The appellant and Kevin D. got out of the Explorer, and Kevin L. drove to the grocery store across the street from the car wash. Pirtle got out of the Explorer and walked toward the car wash to help Kevin D. and the appellant. The victim came out of the Phillips 66 convenience store. Pirtle said that he saw Kevin D. hit the victim with the gun, that the victim turned around and hit Kevin D., and that Kevin D. shot the victim. Pirtle, Kevin D., and the appellant ran through the car wash bays and got back into the Explorer. Their seating arrangement was the same as before except that Pirtle was sitting in the middle of the backseat and the appellant was sitting directly behind Deangelo.

Pirtle testified that Kevin L. drove his two sons home and that they kept Pirtle's gun. Then Kevin L. drove Pirtle home. The next morning, the police arrived at Pirtle's house and arrested him. The police searched the house for the gun but did not find it. Pirtle acknowledged that he had testified in two previous trials related to this case, that he pled guilty to facilitation of second degree murder, and that he received a fifteen-year sentence to be served at thirty percent. He said that prior to the shooting on July 21, 2008, he had been arrested as a juvenile for evading arrest, bringing a weapon onto school property with intent to go armed, and disorderly conduct. He said that he was affiliated with the Gangster Disciples but that he had never committed a crime for the gang.

On cross-examination, Pirtle acknowledged that although Kevin L. claimed he did not have any money, Kevin L. bought vodka from the liquor store. Pirtle acknowledged that Kevin L. drove to the liquor store because he thought Mexicans cashed their checks there. Pirtle acknowledged testifying at Kevin L.'s trial that Kevin L. told them to rob a woman at the liquor store, not an African-American man. Pirtle spoke with the police on January 22, 2008, but did not tell them his complete story until January 2010, almost two years after the shooting. He acknowledged that he lied to the police when he spoke with them on January 22 but said he did not remember telling them that he pulled the gun out of his pants at the car wash and gave it to Kevin D. He also acknowledged that he talked to a court-appointed mental health evaluator and that he lied to the evaluator. He said he did not remember telling the evaluator that he blacked out and had no memory of the crimes. Pirtle acknowledged that Kevin D. used Pirtle's gun to shoot the victim. However, he said, "I had something to do with [the shooting], but I didn't get the chance to help because by the time I got over there everything was already happening." He acknowledged that Kevin D. and Deangelo also were members of the Gangster Disciples.

The defense played Pirtle's January 22, 2008, video-recorded interview for the jury. During the interview, Pirtle told the officers the following: The four Bufords picked him up about 2:00 p.m. on January 21, 2008, and they rode around for hours. They stopped at the grocery store across the street from the car wash on Clarksville Pike. Kevin D. and a "lightskinned dude" saw the victim, got out of the Explorer, and walked to the car wash. Pirtle also got out of the Explorer and walked across the street to the car wash. The victim walked through one of the car wash bays and went into the Phillips 66 convenience store. The appellant and Kevin D. waited in a "dark spot" outside. When the victim came out of the store, Kevin D. and the light-skinned man "got him." Kevin D. hit the victim on the head with the gun, wrestled with the victim, and shot him. Pirtle did not hear Kevin D. tell the victim, "Give me your wallet." Pirtle said that he was "right there with them" and that Kevin L. was waiting in the Explorer, which was still in the grocery store parking lot across the street. After the shooting, Pirtle, Kevin D., and the light-skinned man ran across the street to the Explorer. Pirtle did not know the light-skinned man's name and had never seen him before. Initially, Pirtle claimed that Kevin D. and Deangelo owned the gun. However, he later admitted that the gun was his and that he bought it "off the streets." He said that the gun was a "nine" and that he thought it was a Smith and Wesson. He explained that about three weeks before the shooting, he gave the gun to Kevin D. When Kevin D. and Deangelo picked him up

- 6 -

on the afternoon of January 21, 2008, they returned the gun to him. However, before the shooting, Pirtle pulled the gun out of his pants and gave it back to them so they could "go hit the lick." He said that Kevin L. knew they were going to rob the victim but that Kevin L. did not know Kevin D. was going to shoot the victim. Pirtle told the officers that "we was all in it together" but that Kevin D. "took it too far." After the shooting, everyone was "talking bad" to Kevin D. for his having shot the victim. At the conclusion of the interview, the police officers told Pirtle that they had talked with Kevin D., that Kevin D. admitted shooting the victim, and that Kevin D. claimed he gave the gun to Pirtle after the shooting. Pirtle denied knowing the location of the gun. He said that Kevin D. and Deangelo had the gun when Kevin L. dropped them off at home.

On redirect examination, Pirtle acknowledged that much of what he told the officers during the January 22 interview was consistent with his testimony at the appellant's trial and with testimony he gave at previous trials. He said the light-skinned man was the appellant.

Sergeant Chris Steele of the MNPD testified that on January 21, 2008, he arrived at the crime scene about twenty minutes after the initial call. Shortly after his arrival, he learned about a video of the shooting and obtained it from a nearby business. He also spoke with Donna Jones, who described the suspect vehicle and gave him a license tag number. About thirty minutes later, officers located the vehicle, which was owned by Kevin L. and his wife, at a residence. Officers began watching the residence. When two vehicles left the home, officers followed them to the McDonald's on Gallatin Road. Kevin L., who was in one of the vehicles, agreed to go with the police to the police department. Sergeant Steele interviewed Kevin L. He also interviewed Kevin D., Deangelo, and Raymond Pirtle. Sergeant Steele interviewed Pirtle again on January 29, 2009, and showed Pirtle a photograph array. Pirtle selected the appellant's photograph and identified him as the light-skinned man present at the time of the shooting. The grand jury indicted the appellant, the police arrested him, and Sergeant Steele interviewed him on February 2, 2009.

The State played the appellant's video-recorded interview for the jury. During the interview, the appellant said he did not understand why he was being charged with murder when he did not shoot the victim. He claimed that his brother, nephews, and Raymond Pirtle picked him up from "the mission" on January 21 and that they rode around in the Explorer. The appellant wanted Kevin L. to drop him off at the Phillips

66 convenience store. Kevin D. told everyone in the Explorer that he needed some money and that he was going to rob someone, but the appellant and Kevin L. told him not to commit a robbery. Kevin L. parked across the street from the car wash on Clarkville [sic] Pike, and the appellant and Kevin D. walked through the car wash bays to the Phillips 66 convenience store. Pirtle was behind them. The victim came out of the convenience store as the appellant was about to go inside. The victim walked by the appellant, the appellant heard a gunshot, and Kevin D. and Pirtle ran across the street to the Explorer. The appellant also ran to the Explorer because he was scared and "didn't want to get left." After the incident, Kevin L. dropped off the appellant at "the mission." The appellant said that he did not encourage Kevin D. to rob the victim, that he did not know Kevin D. was going to rob the victim, and that he tried to stop Kevin D. when he saw what was happening.

On cross-examination, Sergeant Steele acknowledged that he showed "photographic line-ups" containing the appellant's photograph to Donna Jones and her son. Ms. Jones did not identify anyone, but her son identified Kevin D. and Raymond Pirtle. Sergeant Steele showed the Joneses arrays containing the appellant's photograph, but they did not identify him. Sergeant Steele said he used "trickery" during the appellant's interview in order to get the appellant to talk with him. On redirect examination, Sergeant Steele acknowledged that both of the Joneses said they saw three people run away from the shooting.

Dr. Sandra Thomas, an assistant medical examiner for Davidson County, testified as an expert in forensic pathology that she did not perform the victim's autopsy but that she reviewed his autopsy report and concurred with its results. His cause of death was a gunshot wound to the torso, and his manner of death was homicide. The bullet entered the victim's back on the left side; struck his heart, spleen, and a couple of other muscular structures; and exited his left chest. The bullet traveled back to front, left to right, and slightly downward. The victim would have lived for a few minutes after receiving the wound. The victim had two twenty-dollar bills, a tube of Chapstick, a pack of cigarettes, two lighters, and a pocketknife on his person. On cross-examination, Dr. Thomas testified that the victim would have been able to run after the shooting.

*State v. Robert Nelson Buford, III*, No. M2011-00323-CCA-R3-CD, 2013 WL 375424, at *1-6 (Tenn. Crim. App. Jan. 31, 2013).

**Post-Conviction Hearing**

Petitioner testified that his co-defendant, Raymond Pirtle, was brought into the courtroom to testify against him at trial "in a yellow jumpsuit and some chains around his waist and chains around his legs and had handcuffs on." Petitioner was wearing "street clothes." He said that trial counsel did not object to Mr. Pirtle's attire, and Petitioner believed that trial counsel's failure to object made the jury think that Petitioner was "guilty by association" and that it "adversely affect[ed] the jury's decision of . . . [his] character." Petitioner did not mention anything to trial counsel at the time about Mr. Pirtle's attire.

Petitioner testified that trial counsel filed a motion to suppress his statement, and the motion was overruled. Petitioner thought that trial counsel should have then sought an interlocutory appeal. He said that trial counsel raised the suppression issue on appeal, and this court held that the statement should have been suppressed but concluded that the error was harmless. He believed that there would have been a different verdict if trial counsel had been successful in suppressing his statement.

Petitioner testified that he asked trial counsel to find out the identity of "Little E" because the State said that "Little E" was a person that Petitioner had attempted to rob earlier in the day before the shooting. Petitioner testified that trial counsel did not believe that Petitioner robbed "Little E," and trial counsel thought that "it was a made up story." Petitioner testified:

> To my knowledge and understanding, I asked him of course a couple of times questions about that while I was incarcerated before trial, and, uh, it was as if - - it was if he don't exist, couldn't nobody find no information on him. I don't think, um, me myself I was asking the question that since the State used it against me and it was brung up at trial that I robbed this person that evidently this guy must be for real, but that State witness, that a State witness and that I robbed him, but no one would give me an answer where is he at? He never testified at trial.

Petitioner said that no one at trial corroborated Mr. Pirtle's testimony that Petitioner robbed "Little E." He did not know if "Little E" existed, and trial counsel never sent an investigator to look for "Little E." Petitioner felt that "Little E's" testimony would have rebutted Mr. Pirtle's testimony that Petitioner committed a robbery earlier in the evening of the shooting.

Trial counsel testified that he has been licensed to practice law since 2000, and the majority of his career has been criminal defense work. Trial counsel did not feel the need to object to Mr. Pirtle's attire at trial. Trial counsel testified:

I would have preferred it that way and it is because Mr. Pirtle was a co-defendant but he was also testifying against us and was the State's key evidence. I wanted him to look like a prisoner. I wanted him to look like a liar, so the contrast between [Petitioner] who was wearing, if I remember, had on street clothes and Mr. Pirtle who was wearing jail clothes, I don't remember which color, but he was wearing jail clothes that was something I wanted.

Trial counsel agreed that he made a strategic decision not to object to the clothing. He said: "I would have never, it would have never occurred to me to try and put the lying snitch in a nice suit."

Trial counsel did not recall if he determined whether "Little E" existed. He said:

I know that my theory of the case was that Little E was a fiction and [sic] the testifying co-defendant. I am going to call him the snitch. The snitch had told this crazy story about several attempted robberies, driving all over town. It was fairly obvious to me that they were to justify the many different places that the snitch had been and I believed and I thought my client believed that that was all a fiction. The challenge was to show to the jury that that wasn't true, so I did not attempt to locate Little E. Although I agree if a Little E had come into court and testified it would have been powerful.

*     *     *

I mean, you know, my sole theory of how to handle the snitch was to cross-examine him. There was no evidence that I was aware of that would rebut what he said. That was a problem I was never aware that Little E actually existed.

Trial counsel testified that if "Little E" would have confirmed Mr. Pirtle's testimony that Petitioner robbed "Little E" earlier on the day of the shooting, "that would have been very, very bad."

On cross-examination, trial counsel testified that he did not send an investigator out to find "Little E." He thought that there had been an investigator assigned to the case at one point through Petitioner's previous counsel. Trial counsel testified: "I don't recall what is in that file, but I can tell you that I was confident that Little E didn't exist."

Trial counsel did not agree with this court's finding that the admission of Petitioner's statement at trial was harmless error. When asked if there was anything else

- 10 -

he could have done at trial to keep Petitioner's statement from being admitted, trial counsel testified:

> You know, I - - at the trial not that I am aware. On appeal, on direct appeal I think that, I mean, obviously I raised the issue. The Court agreed with me. But, I probably should have and I believe I even argued harmless error in the brief, but I think that is where I should have focused my time because I think [Petitioner] and I both anticipated that it was a clear error that the trial court made and the question would be whether it was harmless, so I guess looking back if I was going to the Court of Criminal Appeals on that case again I would spend a lot more time on the harmless error issue.

Trial counsel said that Petitioner's statement did not "admit involvement but sort of corroborated the fact that they were riding around in a car." He further testified:

> I believe that . . . his statement, while he did not admit guilt it was sufficiently corroborative of the snitch and that was my fear the whole time was that all of it together was sort of a cloud of guilt. I think without his statement it is a different case and then you've just literally got Mr. Pirtle saying that my client is there and that is it.

**Analysis**

Petitioner appeals the judgment of the post-conviction court denying him relief for his claims of ineffective assistance of counsel. Petitioner argues that his trial counsel's representation fell outside the range of acceptable professional performance for (1) failing to properly investigate Mr. Pirtle's claim that Petitioner had robbed "Little E" earlier in the evening of the shooting; (2) failing to object to Mr. Pirtle's clothing at trial; (3) failing to suppress Petitioner's statement; and (4) failing to argue on appeal that facilitation was not a predicate felony of felony murder.

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103; *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The

> appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

*Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); *see Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011); *Frazier v. State*, 354 S.W.3d 674, 679 (Tenn. 2010).

A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence. T.C.A § 40-30-110(f); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier*, 303 S.W.3d at 679.

A petitioner has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. at 687; see *Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Id.* at 697.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1966) (*citing Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Furthermore, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

First, Petitioner contends that trial counsel failed to investigate Mr. Pirtle's claim that Petitioner robbed someone named "Little E" earlier in the evening of the shooting. Concerning this issue, the post-conviction court found:

> Petitioner next asserts that his trial attorney was ineffective by failing to investigate and interview the alleged robbery victim, "Little E." A key aspect of counsel's performance pertinent to the allegations raised in this case is counsel's duty to investigate. *Strickland*, 466 U.S. at 691. Defense counsel "must conduct appropriate investigations, both factual and legal," and "must assert them in a proper and timely manner[.]" *Id*. As the United States Supreme Court has said, "counsel has the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. [Trial counsel] testified that he did not attempt to locate "Little E" because he did not believe that "Little E" existed. His strategy to address the allegation of robbing "Little E" was to cross-examine Mr. Pirtle about the alleged robbery. While the Petitioner disagrees with this strategy, there is no evidence that [trial counsel's] decision was a result of deficient representation. As such, this Court finds that the Petitioner has not proven by clear and convincing evidence that [trial counsel's] performance on this issue was ineffective.

We agree with the post-conviction court that Petitioner has not proven factual allegations by clear and convincing evidence that support his claim of ineffective assistance of counsel. Trial counsel testified that he chose not to investigate "Little E" because he was confident that this person did not exist. He felt that Mr. Pirtle "had told this crazy story about several attempted robberies, driving all over town. It was fairly obvious to [trial counsel] that they were [trying] to justify the many different places that [Mr. Pirtle] had been[.]" While trial counsel agreed that "Little E's" testimony would have been "powerful," he noted that if "Little E" confirmed Mr. Pirtle's testimony that Petitioner robbed "Little E" earlier on the day of the shooting, "that would have been very, very bad." Petitioner did not present "Little E" at the post-conviction hearing or any evidence concerning what "Little E's" testimony would have been at trial or even that "Little E" actually existed. This Court has routinely held that when a petitioner in a post-conviction proceeding asserts that trial counsel was ineffective by failing to call certain witnesses to testify, or by failing to interview certain witnesses, these witnesses must be called to testify at the evidentiary hearing. Otherwise, a petitioner is asking this Court to grant relief based on speculation. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. 1990). Petitioner is not entitled to relief on this ground.

Second, Petitioner asserts that trial counsel was ineffective for failing to object to Mr. Pirtle's clothing at trial. Petitioner was dressed in "street clothes" while Mr. Pirtle, who was a co-defendant, was dressed according to Petitioner "in a yellow jumpsuit and

- 13 -

some chains around his waist and chains around his legs[,] and [he] had handcuffs on." Concerning this issue, the post-conviction court found:

> The Petitioner contends that allowing the co-defendant to testify in jail attire prejudiced him because the jury perceived that the Petitioner was guilty by association. [Trial counsel] stated that it did not occur to him to object to the co-defendant's jail attire, and that he preferred that the co-defendant wore jail attire as he testified because it made the co-defendant who testified on behalf of the State, look like a criminal. On this issue, the Petitioner has not presented proof that he was prejudiced by any perception of the jury based on the attire of the co-defendant. Therefore, the Court finds that the Petitioner has failed to show that [trial counsel] was ineffective on this issue.

Again we agree with the post-conviction court's findings. Trial counsel specifically testified that he made a strategic decision not to object to Mr. Pirtle being clothed in jail attire during his testimony at trial. He noted that Mr. Pirtle was a co-defendant and the State's "key evidence." Trial counsel testified: "I wanted him to look like a prisoner. I wanted him to look like a liar[.]" We find that trial counsel made a strategic decision not to object to Mr. Pirtle's clothing at trial. It is not the function of this court to "second guess" tactical and strategic choices pertaining to defense matters if the choices are informed ones based upon adequate preparation as in this case. *See Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995); *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982); and *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). The fact that a particular strategy or tactical decision failed does not by itself establish deficiency. *Goad*, 983 S.W.2d at 370. Petitioner is not entitled to relief on this ground.

Third, Petitioner argues in his appellate brief that trial counsel's "failure to suppress the appellant's statement at the trial, but to argue successfully in front of this Honorable Court should be seen as inadequate representation." Petitioner's entire argument on this ground consists of the following: "While the Court of Criminal Appeal[]s deemed the trial court's error to be harmless, it is clear that coupled with Mr. Pirtle's testimony, the appellant was prejudiced by his counsel's shortcomings in this matter." Concerning this issue, the post-conviction court found:

> The record reflects that the trial court denied the motion to suppress the Petitioner's statement. The Court of Criminal Appeals addressed the issue on direct appeal finding that, in allowing the statement, the trial court committed harmless error. *See State v. Robert Nelson Buford*, No. M2011-00232-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 76 (April 18, 2012). Because [trial counsel] moved the trial court to suppress the statements, and because [trial counsel] asserted this claim on appeal, and the issue was addressed by the Court of Criminal Appeals, this Court

finds that the Petitioner's claim that [trial counsel] was ineffective in failing to move the court to suppress the statement is without merit.

The record supports the post-conviction court's findings. As noted by the post-conviction court, this court on direct appeal found that Petitioner's statement was improperly admitted but that the error was harmless. This court found:

The trial court's admitting [Petitioner's] statement, taken in violation of his right to remain silent, did not impact the trial from beginning to end and is a non-structural constitutional error. Therefore, the State has the burden of proving beyond a reasonable doubt that the error did not contribute to the appellant's conviction. In our view, the State has met its burden. Pirtle testified that the appellant robbed Little E at the Buena Vista Market. Kevin L. wanted everyone to commit another robbery, drove to the Xpress car wash, and saw the victim counting money. Kevin L. told everyone in the Explorer that the victim was the person they needed to rob. Pirtle said that the appellant and Kevin D. got out of the Explorer, walked through the car wash bay, and walked to the Phillips 66 convenience store. When the victim came out of the store, Kevin D. shot him and everyone ran back to the Explorer. As stated previously, Ms. Jones' testimony and the fingerprint evidence sufficiently corroborated Pirtle's testimony. The jury obviously considered the evidence carefully, concluding that the appellant did not have the intent required to convict him as charged but that he provided "substantial assistance" to Kevin D. Given the evidence, we conclude that the trial court's error was harmless.

*State v. Robert Nelson Buford, III*, 2013 WL 375424, at \*12. At the post-conviction hearing, trial counsel testified that he was not aware of anything that he could have done differently at trial to prevent Petitioner's statement from being admitted. While trial counsel did posit that he should have done more to argue on appeal that the error was harmless, Petitioner has not asserted on appeal any specifics of what more trial counsel could have done concerning this issue. Petitioner has not proven facts by clear and convincing evidence to establish that trial counsel was deficient in this area. Petitioner is not entitled to relief on this ground.

Finally, Petitioner contends that trial counsel's "inability on appeal to distinguish Tenn. Code Ann. § 39-13-202(a)(2) and [Petitioner's] conviction for the facilitation of attempted robbery and the facilitation of felony murder should be found to be ineffective assistance of counsel." He further asserts that "facilitation was not contemplated by the General Assembly as a qualifying felony for the purposes of felony murder." Petitioner did not raise this issue in his post-conviction petition, his amended petition, or at the post-conviction hearing. As pointed out by the State, Petitioner may not raise an issue for the

- 15 -

first time on appeal.  *See Cauthern v. State,* 145 S.W.3d 571, 579 (Tenn. Crim. App. 2004)("[A]n issue raised for the first time on appeal is waived.").  Therefore, this issue is waived, and Petitioner is not entitled to relief.

Petitioner also mentions in his conclusion that the "numerous instances" of ineffective assistance of counsel, "when viewed in the aggregate" establish deficient representation by trial counsel.  In essence, Petitioner is arguing cumulative error. The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010).  This court has also considered this doctrine in the context of ineffective assistance of counsel. *See Gary Hawkins v. State*, No. W2016-00723-CCA-R3-PC, 2017 WL 2829755, at *8 (Tenn. Crim. App. June 30, 2017). Since we have discerned no error in this case, cumulative error analysis does not apply. Petitioner is not entitled to relief on this issue.

## Conclusion

For the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE